**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

JEFF HEALY,

   Plaintiff,

  v.

SHAGUFTA YASMEEN, et al.,

   Defendants.

No. 2:19-CV-2052-WBS-DMC-P

FINDINGS AND RECOMENDATIONS

   Plaintiff, a prisoner proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983. Pending before the Court are Defendants' motion for summary judgment, ECF No. 48, Plaintiff's Opposition, ECF No. 51, and Defendants' Reply, ECF No. 52.

**I. PLAINTIFF'S ALLEGATIONS**

   After the screening phase, Plaintiff's remaining claims are against three defendants, namely, (1) Dr. Shagufta Yasmeen, (2) Dr. Sahir Naseer, and (3) Dr. G. Williams. See ECF No. 19, pg. 2. Plaintiff alleges the following:

   **a.  Plaintiff's Right Foot and Ankle**

   Plaintiff suffers from chronic pain in his right foot and ankle due to an incident from 2005. See ECF No. 1, pg. 6. Plaintiff began complaining to Defendants Yasmeen and Naseer about his foot and ankle in 2015, but they ignored his complaints. See id.  On June 21,

2016, Plaintiff fell while transferring from the toilet to his wheelchair further injuring his right foot and ankle.  See id.  An x-ray examination of Plaintiff's foot showed he suffered a possible fracture, but Defendants refused to order an x-ray of Plaintiff's ankle despite Plaintiff's protest.  See id.  On April 30, 2017, Defendant Naseer finally ordered an x-ray of plaintiff's ankle that revealed the loss of the subtalar joint suggesting collapse or malalignment in his ankle.  See id.  According to Plaintiff, Defendants Yasmeen and Naseer refused to remedy the injury or treat his pain.  See id.

### b. Plaintiff's Spine

Plaintiff alleges that he has complained to Defendants Yasmeen and Naseer since 2015 about severe chronic pain in his neck and back, general loss of mobility, and the loss of feeling/strength in his arms and legs.  See id. at 7.  Plaintiff has also "complained to [Defendant] Williams about these issues on multiple occasions."  Id.  Plaintiff states, "All three of these doctors [Defendants Yasmeen, Naseer, and Williams] have refused to discuss these complaints, order x-rays or MRI's, or any diagnostic tests.  Neither have these three doctors offered surgery or done anything to alleviate the severe pain."  Id.  Plaintiff alleges that after more than eighteen months of complaining, on October 24, 2018, Plaintiff finally had an MRI done of his "L-spine, although continues to ignore my C-spine problems."  Id.  According to Plaintiff, the MRI showed damage to the L-spine, but Defendant Naseer "offers no discussion, or remedy, for my L-spine problems or order a C-spine MRI."  Id. (errors in original).  Plaintiff concludes this claim stating that Defendants "Yasmeen, Naseer, and Williams have repeatedly stated my heart/lungs made me unfit for any surgeries, but never sent me to a pulmonary specialist."  Id.

### c. Plaintiff's Leg Wounds

Plaintiff alleges that from 2015-2016 Defendant Yasmeen refused to "follow specialists' recommendations" and refused to supply Plaintiff with dressing supplies to treat wounds on his lower legs caused by MRSA (methicillin-resistant staphylococcus aureus) and reduced circulation.  See ECF No. 1, pg. 8.  Plaintiff also alleges he has been unable to use dressing due to the pain they cause him after Defendants Yasmeen, Williams, and Naseer discontinued his pain medication.  See id.  Defendants' prevention of Plaintiff from using

compression dressing, he alleges, exacerbated the wounds on his legs. See id.

### d. **Plaintiff's Shoulders**

In January 2016, Plaintiff injured his left shoulder. See ECF No. 1, pg. 9. After weeks of complaints from Plaintiff, Defendant Yasmeen ordered an x-ray. See id. The x-ray's results showed Plaintiff likely suffered a rotator cuff injury. See id. Despite the x-ray's results and Plaintiff telling Defendant Yasmeen that he felt a muscle tear, Defendant Yasmeen refused to evaluate the shoulder anymore, arbitrarily attributing Plaintiff's injury to arthritis. See id. Defendants Yasmeen and Williams reported that Plaintiff was non-compliant and faking his symptoms when he failed to perform physical therapy exercises. See id.

On December 13, 2016, after eleven months of Plaintiff complaining about his shoulder, Defendant Yasmeen ordered an MRI of Plaintiff's shoulder. See id. The MRI results showed that Plaintiff suffered five tears in his shoulder. See id. Defendant Naseer ruled out surgery to fix Plaintiff's shoulder, since he believed he is unfit to undergo any surgical procedure. See id. But Defendant Naseer never allowed Plaintiff to see specialists who could perform a surgical viability evaluation. See id. Defendant Naseer sent Plaintiff to physical therapy again. See id. at 10. The physical therapist stated that the damage to Plaintiff's left shoulder was too extensive for physical therapy to be of any benefit. See id.

In November 2017, Plaintiff's left shoulder became partially dislocated, showing that its condition was worsening. See id. Plaintiff became increasingly reliant on his right arm and was having difficulty performing his activities of daily living. See id. In late 2018, Plaintiff suffered an injury to his right shoulder. See id. Plaintiff complained to Defendant Naseer on a weekly basis for six months before Defendant Naseer ordered an MRI. See id. The results of the MRI on May 8, 2019, showed two tears, narrowing joint space, and cartilage loss. See id. Defendant Williams falsely reported that Plaintiff lied about his range of motion abilities, preventing Plaintiff from receiving treatment. See id.

### e. **Plaintiff's Bedside Commode**

Plaintiff alleges that he has fallen on multiple occasions while transferring between his wheelchair and toilet. See ECF No. 1, pg. 11. Plaintiff states that an occupational therapist

3

1 recommended Plaintiff use a bedside commode to help him transfer between his wheelchair and
2 toilet on September 23, 2015. See id. Plaintiff provides that Defendant Yasmeen refused to
3 supply Plaintiff a bedside commode and sent Plaintiff to Defendant Williams. See id. Plaintiff
4 alleges that Defendant Williams stated that "a shower chair over the toilet would be unsafe and
5 unstable" despite Plaintiff's explanation that he uses one every time he showers and never falls.
6 Id. Defendant Naseer "also refused to supply a bedside commode." Id. Between February 1,
7 2017, and April 12, 2018, Plaintiff fell multiple times "with injuries and pain while transferring to
8 or from the toilet." Id. On March 1, 2018, "another physician recognized my obvious need and
9 ordered a bedside commode. It was supplied on April 12, 2018." Id. Plaintiff alleges that he has
10 not fallen while transferring to or from the new toilet. See id.

### f. Plaintiff's Photophobia

Plaintiff suffers from severe photophobia. See ECF No. 1, pg. 12. Plaintiff used to have solar shield sunglasses and accommodations to his cell that helped his condition. See id. Although the sunglasses and accommodations were supposed to be permanent, unidentified officers decided they were supposed to be renewed. See id. Defendant Yasmeen refused to renew Plaintiff's treatment. See id. After nine to ten months of complaints from Plaintiff, Defendant Naseer ordered an incorrect pair of solar shield sunglasses and refused to order the correct kind. See id.

### g. Ambulance

Plaintiff alleges that since 2012, Plaintiff has been required to be transported to outside appointments by ambulance. See ECF No. 1, pg. 15. An ambulance allows for a reclined body position and correct levels of oxygen supplementation. See id. The ADA vans are the alternative mode of transportation provided to Plaintiff, but the vans do not provide reclined transport, sufficient oxygen, nor adequate space to elevate his legs in his wheelchair during transportation. See id. Defendants Yasmeen and Naseer refuse to order transportation by ambulance for Plaintiff, causing Plaintiff to miss many appointments, including four leg surgeries. See id. Defendant Williams also wrote false reports concerning Plaintiff's transportation needs that ignored his supplemental oxygen requirements. See id.

      **h. <u>Gadolinium</u>**

Plaintiff was injected with "Gadolinium" contrast dye during MRI examination on October 10, 2018, and January 2, 2019.  <u>See</u> ECF No. 1, pg. 16.  Soon after the October 10, 2018 MRI, Plaintiff complained to defendant Naseer about new and unusual bone/joint pain and fuzzy thought processes.  <u>See id.</u>  Defendant dismissed Plaintiff's concerns as symptoms of arthritis and refused to address Plaintiff's diminished mental capabilities.  <u>See id.</u>  In February 2019, Plaintiff learned his issues aligned with symptoms of "Gadolinium" failing to leave the body.  <u>See id.</u>  Plaintiff alleges Defendant Naseer was aware of the harmful effects of "Gadolinium" use, and never informed plaintiff prior to it being used on him.  <u>See id.</u>

## II. STANDARD FOR SUMMARY JUDGEMENT

The Federal Rules of Civil Procedure provide for summary judgment or summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The standard for summary judgment and summary adjudication is the same.  <u>See</u> Fed. R. Civ. P. 56(a), 56(c); <u>see also</u> <u>Mora v. ChemTronics</u>, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Id.</u>, at 323 (quoting former Fed. R. Civ. P. 56(c)); <u>see also</u> Fed. R. Civ. P. 56(c)(1).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the

1  allegations or denials of its pleadings but is required to tender evidence of specific facts in the
2  form of affidavits, and/or admissible discovery material, in support of its contention that the
3  dispute exists.  See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11.  The
4  opposing party must demonstrate that the fact in contention is material, i.e., a fact that might
5  affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S.
6  242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th
7  Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could
8  return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436
9  (9th Cir. 1987).  To demonstrate that an issue is genuine, the opposing party "must do more than
10 simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record
11 taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no
12 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).  It is sufficient that "the
13 claimed factual dispute be shown to require a trier of fact to resolve the parties' differing versions
14 of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.

15           In resolving the summary judgment motion, the court examines the pleadings,
16 depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.
17 See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed, see Anderson,
18 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the
19 court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587.
20 Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to
21 produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen
22 Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.
23 1987).  Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for the
24 judge, not whether there is literally no evidence, but whether there is any upon which a jury could
25 properly proceed to find a verdict for the party producing it, upon whom the onus of proof is
26 imposed."  Anderson, 477 U.S. at 251.
27 / / /
28 / / /

## III. DISUCSSION

Defendants state that they did not violate Plaintiff's Eighth Amendment rights and that in the alternative they are entitled to qualified immunity.

**a. Medical Needs**

The treatment a prisoner receives in prison and the conditions under which the prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual punishment.  See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan, 511 U.S. 825, 832 (1994).  The Eighth Amendment ". . . embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102 (1976).  Conditions of confinement may, however, be harsh and restrictive.  See Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  Nonetheless, prison officials must provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986).  A prison official violates the Eighth Amendment only when two requirements are met: (1) objectively, the official's act or omission must be so serious such that it results in the denial of the minimal civilized measure of life's necessities; and (2) subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of inflicting harm.  See Farmer, 511 U.S. at 834.  Thus, to violate the Eighth Amendment, a prison official must have a "sufficiently culpable mind."  See id.

Deliberate indifference to a prisoner's serious illness or injury, or risks of serious injury or illness, gives rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 105; see also Farmer, 511 U.S. at 837.  This applies to physical as well as dental and mental health needs.  See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982), abrogated on other grounds by Sandin v. Conner, 515 U.S. 472 (1995).  An injury or illness is sufficiently serious if the failure to treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and wanton infliction of pain." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc); see also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994).  Factors indicating seriousness

7

1    are: (1) whether a reasonable doctor would think that the condition is worthy of comment; (2)
2    whether the condition significantly impacts the prisoner's daily activities; and (3) whether the
3    condition is chronic and accompanied by substantial pain.  See Lopez v. Smith, 203 F.3d 1122,
4    1131-32 (9th Cir. 2000) (en banc).

5    　　　　　The requirement of deliberate indifference is less stringent in medical needs cases
6    than in other Eighth Amendment contexts because the responsibility to provide inmates with
7    medical care does not generally conflict with competing penological concerns.  See McGuckin,
8    974 F.2d at 1060.  Thus, deference need not be given to the judgment of prison officials as to
9    decisions concerning medical needs.  See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir.
10   1989).  The complete denial of medical attention may constitute deliberate indifference.  See
11   Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986).  Delay in providing medical
12   treatment, or interference with medical treatment, may also constitute deliberate indifference.  See
13   Lopez, 203 F.3d at 1131.  Where delay is alleged, however, the prisoner must also demonstrate
14   that the delay led to further injury.  See McGuckin, 974 F.2d at 1060.

15   　　　　　Negligence in diagnosing or treating a medical condition does not, however, give
16   rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 106.  Moreover, a
17   difference of opinion between the prisoner and medical providers concerning the appropriate
18   course of treatment does not give rise to an Eighth Amendment claim.  See Jackson v. McIntosh,
19   90 F.3d 330, 332 (9th Cir. 1996).

20   　　　　　1. Plaintiff's Right Foot and Ankle

21   　　　　　Plaintiff suffers from chronic pain in his right foot and ankle due to an incident
22   from 2005.  See ECF No. 1, pg. 6.  Plaintiff began complaining to Defendants Yasmeen and
23   Naseer about his foot and ankle in 2015, but they ignored his complaints.  See id.  According to
24   Plaintiff, Defendants Yasmeen and Naseer refuse to remedy the injury or treat his pain.  See id.
25   Defendant Williams was not involved in the care of Plaintiff's foot and ankle.

26   　　　　　Despite Plaintiff complaining about treatment starting in 2015, Defendants only
27   address this issue starting March 8, 2018. [1]  See ECF No. 48-3, pg. 18.  Further, Defendants do

---

28   [1] The March 8, 2018, date was discovered after sifting through Defendants' statement of undisputed facts. The

not address Defendant Yasmeen's treatment of Plaintiff with regard to Plaintiff's right foot and ankle. These critical omissions in Defendants' motion requires a finding that there remains a genuine dispute of material fact concerning Defendant Yasmeen and Naseer's treatment of Plaintiff's foot and ankle. Therefore, the Undersigned recommends Defendants' motion is denied as to the treatment of Plaintiff's foot and ankle.

### 2. Plaintiff's Spine

Plaintiff alleges that he has complained to Defendants Yasmeen and Naseer since 2015 about severe chronic pain in his neck and back, general loss of mobility, and the loss of feeling/strength in his arms and legs. See ECF No. 1, pg. 7. Plaintiff has also "complained to [Defendant] Williams about these issues on multiple occasions." Id. Plaintiff states, "All three of these doctors [Defendants Yasmeen, Naseer, and Williams] have refused to discuss these complaints, order x-rays or MRI's, or any diagnostic tests. Neither have these three doctors offered surgery or done anything to alleviate the severe pain." Id. Plaintiff alleges that after more than eighteen months of complaining, on October 24, 2018, Plaintiff finally had an MRI done of his "L-spine, although continues to ignore my C-spine problems." Id. According to Plaintiff, the MRI showed damage to the L-spine, but Defendant Naseer "offers no discussion, or remedy, for my L-spine problems or order a C-spine MRI." Id. (errors in original). Plaintiff concludes this claim stating that Defendants "Yasmeen, Naseer, and Williams have repeatedly stated my heart/lungs made me unfit for any surgeries, but never sent me to a pulmonary specialist." Id.

#### A. Defendant Yasmeen

Defendants fail to cite to anything in their argument section mentioning any treatment or encounters between Plaintiff and Defendant Yasmeen as it relates to the treatment of Plaintiff's spine. See ECF No. 48-3, pgs. 13, 15, 19, 21, 22, 33 (Defendants' Statement of Undisputed Facts Nos. 26, 34, 50, 53, 97). Therefore, the Undersigned recommends Defendants' motion be denied as to the treatment of Plaintiff's spine by Defendant Yasmeen.

#### B. Defendant Williams

As it relates to the treatment of Plaintiff's spine, Defendants only cite to one

earliest date in Defendants' argument section is March 11, 2018. See ECF No. 48-2, pg. 26.

encounter between Plaintiff and Defendant Williams which occurred on May 25, 2016. See ECF No. 48-3, pgs. 13, 15, 19, 21, 22, 33 (Defendants' Statement of Undisputed Facts Nos. 26, 34, 50, 53, 97). Plaintiff appears to have been examined by Defendant Williams. See ECF No. 48-2, pg. 33. Defendant "Williams assessed that Plaintiff did have a significant amount of myofascial pain" and that Plaintiff, admittedly, was not compliant with the physical therapy routine. Id.

However, Defendants do not cite to anything else regarding Defendant Williams's treatment of Plaintiff's spine. There still remains a genuine issue of material fact as to whether Defendant Williams was deliberately indifferent before and after the May 25, 2016, consultation. As such, Defendants' failed to meet their burden. The Undersigned recommends Defendants' motion be denied as to the treatment of Plaintiff's spine by Defendant Williams.

### C. Defendant Naseer

The earliest date cited to by Defendants concerning Defendant Naseer treating Plaintiff's spine is June 23, 2017. See ECF No. 48-3, pg. 13 (Defendants' Statement of Undisputed Facts No. 26). Defendants cite to another fact indicating that Naseer saw and treated Plaintiff on September 15, 2017. See id. at 15 (Defendants' Statement of Undisputed Facts No. 34).

Additionally, Defendants cite to their statement of undisputed fact number 50 in support of their motion concerning the treatment of Plaintiff's spine. See ECF No. 48-2, pg. 33. It indicates that Defendant Naseer saw Plaintiff again on January 8, 2019, 480 days after the September 15, 2017, visit. See ECF No. 48-3, pg. 19. However, it is unclear exactly how fact 50 relates to the treatment of Plaintiff's spine. Fact 50 is a full page of information. See id. at 19-20. Defendants also cite to it in support of their motion in treating Plaintiff's foot and ankle, shoulders, and photophobia. See ECF No. 48-2, pgs. 31, 33, 36, 38.

Finally, Defendants cite to fact 53 indicating that Naseer saw Plaintiff on February 5, 2019. See ECF No. 48-3, pg. 21. Defendant Naseer "recommended neck stretching exercise and continued monitoring, with consideration of physical therapy for Plaintiff's neck and arm pain after he completed physical therapy for his back pain, which was ongoing." Id. at 22. In a vacuum, Naseer's treatment of Plaintiff on February 5, 2019, seems adequate for that day.

However, the large gap in time between September 2017 and January 2019 along with the ambiguous information provided by Defendants, the Undersigned recommends Defendants' motion be denied as to the treatment of Plaintiff's spine by Defendant Naseer.

### 3. Plaintiff's Leg Wounds

Plaintiff alleges that he has leg wounds that need compression dressings in order to heal.  See ECF No. 1, at 8.  Plaintiff also alleges that the compression dressings cause Plaintiff "excruciating pain" because Defendants discontinued Plaintiff's pain medications to where now he cannot withstand the pain of the compression dressings.  See id.

Because Defendants' counsel failed to clearly layout Defendants' argument as to this issue, the Undersigned understands Defendants' argument to be the following: (1) Defendants regularly treated Plaintiff, and (2) Plaintiff was noncompliant with the compression dressing treatment.  Also, Defendants state, "None of Plaintiff's many encounters with Defendants show that he ever refused compression dressing because of pain."  ECF No. 84-2, pg. 34.  This last sentence sounds like Defendants are arguing that they did not know that it was because of pain that Plaintiff refused the compression dressing.

However, Plaintiff provides a medical document prepared by a medical doctor after seeing Plaintiff expressing that the compression wraps "make [Plaintiff's] legs hurt."  ECF No. 51, pg. 203.  Additionally, the doctor states that he will discuss with Defendant Naseer "about the possibility of increasing his pain regimen for better tolerance of compression rx."  See id.  This raises the question of whether Defendant Naseer knew that Plaintiff refused the compression dressings because Plaintiff was in pain.

Additionally, Defendants state that "Dr. Mehta specifically indicated that compression would be helpful for Plaintiff's ulcer pain, so it was not a matter of pain as the reason why Plaintiff continuously refused to allow compression dressing."  ECF No. 48-2, pg. 34. However, the exhibits Defendants cite to do not support that "Dr. Mehta specifically indicated that compression would be helpful for Plaintiff's ulcer pain".  See ECF No. 48-8, pgs. 41-46 (Declaration of Mathis, Exhibits F and G).

There is an issue here of whether Plaintiff experienced an "unnecessary and

wanton infliction of pain" as a result of Defendants conduct. Defendants may have known that Plaintiff was rejecting the compression dressings because of pain. Defendants also seem to be convinced that the compression dressings are what Plaintiff needs to heal. Without the compression dressings, Plaintiff is in continued pain because of his leg wounds.

Defense counsel could have helped the Court by providing a more fleshed out argument as to this issue. However, the few sentences defense counsel chose do not hold much weight.

In light of the sparsity of Defendants' motion, the nuance of this issue, the questionable evidentiary support by Defendants, and the precedent of viewing the evidence in the light most favorable to the nonmoving party, the Undersigned recommends denying Defendants' motion as to the treatment of Plaintiff's leg wounds.

### 4. Plaintiff's Left Shoulder

The crux of this issue appears to be whether Defendants' violated Plaintiff's constitutional rights for not getting Plaintiff approved for surgery for his left shoulder in 2017. Plaintiff identifies a strange inconsistency as to this issue.

In February of 2017, Defendant Naseer did not recommend surgery for Plaintiff because of his "COPD, degree of disability from leg wounds, and wheelchair-bound status." See ECF No. 48-3, pg. 10. Yet, on July 9, 2019, more than two years later, Defendant Naseer suddenly becomes willing to refer Plaintiff for surgery. See id. at 27. During this time, Plaintiff's right shoulder was injured due to having to depend on his right arm. See ECF No. 1, pg. 10. Plaintiff was cleared for shoulder surgery on October 8, 2019. See ECF No. 48-3, pg. 29.

The Undersigned finds there to be genuine issues of material fact as to (1) why Defendant Naseer or the other Defendants were not willing to refer Plaintiff for surgery prior to 2019; and (2) what circumstances changed for Defendant Naseer to finally be in a position to refer Plaintiff for surgery in 2019. The reasons for denying the referral in 2017 was because of Plaintiff's COPD, leg wounds, and wheelchair-bound status. However, Defendants have not demonstrated that Plaintiff's COPD was better (Plaintiff actually alleges that his COPD was worse in 2019), Defendants demonstrate that Plaintiff's leg wounds have actually worsened

(which seems to indicate that Plaintiff would now be a worse candidate for surgery), and Plaintiff is still wheelchair-bound.

Therefore, the Undersigned recommends denying Defendants' motion to dismiss as to the treatment Plaintiff received regarding Plaintiff's left shoulder.

### 5. Plaintiff's Bedside Commode

Plaintiff alleges that he has fallen on multiple occasions while transferring between his wheelchair and toilet. See ECF No. 1, pg. 11. Plaintiff provides that Defendant Yasmeen refused to supply Plaintiff a bedside commode and sent Plaintiff to Defendant Williams. See id. Plaintiff alleges that Defendant Williams stated that "a shower chair over the toilet would be unsafe and unstable" despite Plaintiff's explanation that he uses one every time he showers and never falls. See id. Defendant Naseer "also refused to supply a bedside commode." Id. Between February 1, 2017, and April 12, 2018, Plaintiff fell multiple times "with injuries and pain while transferring to or from the toilet." Id. On March 1, 2018, "another physician recognized my obvious need and ordered a bedside commode. It was supplied on April 12, 2018." Id. Plaintiff alleges that he has not fallen while transferring to or from the new toilet. See id.

In Defendants' argument section of their motion, they fail to mention how each specific Defendant treated Plaintiff as to the commode issue. See ECF No. 48-2, pg. 37. However, Defendants do provide the Court with string cites to several of Defendants' statement of facts for the Court to sift through and discover how each Defendant handled the commode issue with Plaintiff. See id.

Plaintiff saw Defendant Williams on May 25, 2016, and discussed supplying Plaintiff with a new toilet to use to help him with transferring to and from his wheelchair to the toilet. See ECF No. 48-3, pg. 3. Defendant Williams determined that the toilet Plaintiff already had was safer than the toilets Plaintiff was requesting. See id.; see also Declaration of Williams, Exhibit A.

Defendant Yasmeen saw Plaintiff for a routine appointment on August 9, 2016. See id. at 5. Defendant Yasmeen noted that Plaintiff left during an appointment with Defendant Williams on April 4, 2016, before being evaluated for a shower chair commode. See id. at 6.

1  Yasmeen wrote an order for Plaintiff to be rescheduled.  See id.; see also Declaration of
2  Yasmeen, Exhibit E.
3          On August 22, 2016, Defendant Williams saw Plaintiff where Plaintiff again asked
4  for a new commode, but Williams determined that the risks far outweighed the potential benefits
5  of supplying Plaintiff with the commode Plaintiff wanted.  Id. at 7; see also Declaration of
6  Williams, Exhibit C.  During this visit, Williams noted that Plaintiff had a "good transfer ability,"
7  but "physical therapy was ordered to address level transfers with the patient."  ECF No. 48-5, pg.
8  18 (Declaration of Williams, Exhibit E).
9          On December 7, 2016, Williams "determined that the bedside commode had no
10 additional benefit and was not recommended as it had higher risks than the steel commode
11 Plaintiff was currently using."  ECF No. 48-3, pg. 9.  In coming to this conclusion, Williams
12 discussed Plaintiff's claims of "falling over during transfers in the last five to six months" with
13 Defendant Yasmeen.  Id. at 8.  Both Yasmeen and Williams "noted that Plaintiff had not been
14 falling and that his functional status had been the same since he was seen on August 22, 2016."
15 Id.  After discussing the pros and cons of the new commode, Yasmeen and Williams agreed that
16 the commode Plaintiff was requesting was too high of a risk for Plaintiff.  Id. at 9; see also
17 Declaration of Williams, Exhibit D.
18         Defendants then leave a two-and-a-half-year gap.  The next date cited to,
19 according to Defendants' string of facts cited to in their argument section, is June 18, 2019.  See
20 ECF No.  Plaintiff alleges that he fell multiple times between February 1, 2017, and April 12,
21 2018.  See ECF No. 1, pg. 11.  In light of the large gap of time entirely unaddressed by
22 Defendants as to the issue of the commode, Defendants' motion should be denied as to each
23 Defendant in regard to Plaintiff's commode accommodations.
24         6. Plaintiff's Photophobia
25         Plaintiff alleges that Defendants Yasmeen and Naseer violated his constitutional
26 rights in how Defendants treated Plaintiff's photophobia.  See ECF No. 1, pg. 12.  It appears that
27 Defendant Naseer replaced Defendant Yasmeen as Plaintiff's doctor in January of 2017.  See id.
28 at 8.

A. Defendant Yasmeen

On February 23, 2016, Defendant Yasmeen saw Plaintiff for a routine appointment. See ECF No. 48-3, pg. 2. Defendant Yasmeen noted that Plaintiff used solar shield glasses as recommended by ophthalmology, but Plaintiff requested dark glasses because of photosensitivity. See id. Defendant Yasmeen ordered a pair of "Solar Shield Style Sunglass" on August 8, 2016. ECF No. 48-4, pg. 22 (Declaration of Yasmeen, Exhibit F). These facts indicate that Defendant Yasmeen was not deliberately indifferent to Plaintiff's medical needs as it relates to Plaintiff's photophobia. When Defendant Yasmeen saw Plaintiff, Yasmeen noted Plaintiff's request and ordered glasses to help with Plaintiff's photosensitivity.

Plaintiff's opposition states, "While Dr. Yasmeen may have requested solar shield glasses for me on 8/16/16, at the very least, she never followed up on the request for its approval, and I never received them." ECF No. 51-1, pg. 11. However, in support of this statement Plaintiff only cites to the form used by Yasmeen to order the sunglasses. See id. Therefore, the Undersigned recommends granting Defendants' motion as to Defendant Yasmeen's treatment of Plaintiff concerning Plaintiff's photophobia.

B. Defendant Naseer

Defendant Naseer met with Plaintiff regularly concerning Plaintiff's photophobia. See ECF No. 48-3, pgs. 10-26. During that time Defendant Naseer submitted requests for ophthalmologist and optometrist consultations. Id. Defendant Naseer requested solar glasses for Plaintiff. Id. Further, Defendant Naseer discussed Plaintiff's need for other eye accommodations with an ophthalmologist. Id. They determined that a magnifying glass with a light is not medically necessary. Id. In light of the regular treatment Plaintiff received and the actions taken by Defendant Naseer in regards to Plaintiff's photophobia, the Undersigned recommends granting Defendants' motion to dismiss as to Defendant Naseer's treatment of Plaintiff's photophobia.

Plaintiff's opposition indicates that Plaintiff only has a difference of opinion as to how his photophobia was treated. See ECF No. 51-1, pgs. 2-50. For example, Plaintiff complained that the solar shield glasses were not dark enough or that he needed magnifying glasses. However, Defendant Naseer determined that those were not medically necessary. Thus,

15

the Undersigned recommends granting Defendants' motion to dismiss as to Defendants Naseer's treatment of Plaintiff's photophobia.

### 7. Ambulance

Plaintiff claims that Defendants have been deliberately indifferent to Plaintiff's medical needs as it relates to the mode of transportation used for Plaintiff to travel to medical appointments. Each of the three Defendants denied Plaintiff from being approved to use an ambulance for transportation. Defendant Williams determined on May 25, 2016, that Plaintiff's medical condition would be better serve by not being transported by ambulance. See ECF No. 48-5, pgs. 11-12 (Declaration of Williams, Exhibit A). On July 28, 2016, Defendant Yasmeen noted that there was no indication for transfer by ambulance for offsite appointments. See ECF No. 48-4, pg. 18 (Declaration of Yasmeen, Exhibit D).

On December 28, 2018, Defendant Williams saw Plaintiff concerning Plaintiff's request for ambulance transportation. See ECF No. 48-5, pg. 24 (Declaration of Williams, Exhibit E). Defendant Williams corresponded with another doctor, Doctor Singh, concerning Plaintiff's request for ambulance transportation. See id. at 24-27. Doctor Singh discussed the three criteria required to be transported by ambulance. See id. at 27. They are (1) being bed bound, (2) "requiring constant 3 l or above of oxygen", and (3) "sacral pressure ulcers". See id. Doctor Singh stated, "Patient continues to refuse the mode of transportation and I would like to get him to his appointment. However, he still is not meeting the above 3 criteria." Id. (errors in original).

Defendant Naseer saw Plaintiff on January 29, 2019. See ECF No. 48-6, pg. 111 (Declaration of Naseer, Exhibit A). Defendant Naseer considered the recommendations from Plaintiff's December 28, 2018, visit. See id. Defendant Naseer concluded that Plaintiff's request for ambulance transportation was not recommended "as patient can sit in WC [wheelchair]. Bed bound status would cause more harm and deconditioning." Id.

In opposition, Plaintiff alleges that Defendant Williams falsified the records. See ECF No 51-1, pgs. 5-6. Plaintiff also seems to have a different opinion as to the need for ambulance transportation. See id. Plaintiff cites to many exhibits; however, of the exhibits the

Undersigned could locate, it is not clear how the exhibits support Plaintiff's claims.

The Undersigned finds that there is no genuine dispute of a material fact as to Plaintiff's ambulance transportation claim. Each Defendant determined that Plaintiff was either ineligible for ambulance transportation and/or that the transportation would be harmful to Plaintiff. Therefore, Defendants' motion is granted as to Plaintiff's claim concerning ambulance transportation.

### 8. Gadolinium

Defendants Williams and Yasmeen are not involved in Plaintiff's care for Plaintiff's gadolinium claim. Plaintiff communicated with Defendant Naseer concerning potential side effects from gadolinium on April 18, 2019. See ECF No. 48-6, pg. 138 (Declaration of Naseer, Exhibit A). Naseer noted that according to Naseer's review of Plaintiff's chart, he did not have a history of reactions to gadolinium. See id. At that time, Plaintiff was not scheduled for an MRI where gadolinium would be used. See id. Naseer concluded that there would be "[n]o need to do any kind of testing for contrast allergy at this time." Id. Defendant Naseer also noted that the encounter was not face to face. See id.

In opposition, Plaintiff cites to an article discussing the risks of gadolinium. See ECF No. 51-1, pg. 45. However, this article is inadmissible hearsay. See ECF No. 51, pgs. 315-332. Even if the article was admissible, Naseer's actions would at worst be negligent.

Thus, Naseer's treatment of Plaintiff was not deliberately indifferent to Plaintiff's medical needs. Naseer reviewed Plaintiff's history, noted that there was no past reaction to gadolinium, and noted that Plaintiff's upcoming MRI was not going to use gadolinium. Therefore, Defendants' motion is granted as to Plaintiff's treatment concerning gadolinium.

### B. Qualified Immunity

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In general, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). In ruling upon the issue of qualified

1  immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting the
2  injury, the facts alleged show the defendant's conduct violated a constitutional right. See Saucier
3  v. Katz, 533 U.S. 194, 201 (2001). If a violation can be made out, the next step is to ask whether
4  the right was clearly established. See id. This inquiry "must be undertaken in light of the specific
5  context of the case, not as a broad general proposition . . . ." Id. "[T]he right the official is
6  alleged to have violated must have been 'clearly established' in a more particularized, and hence
7  more relevant, sense: The contours of the right must be sufficiently clear that a reasonable
8  official would understand that what he is doing violates that right." Id. at 202 (citation omitted).
9  Thus, the final step in the analysis is to determine whether a reasonable officer in similar
10 circumstances would have thought his conduct violated the alleged right. See id. at 205.

11            When identifying the right allegedly violated, the court must define the right more
12 narrowly than the constitutional provision guaranteeing the right, but more broadly than the
13 factual circumstances surrounding the alleged violation. See Kelly v. Borg, 60 F.3d 664, 667 (9th
14 Cir. 1995). For a right to be clearly established, "[t]he contours of the right must be sufficiently
15 clear that a reasonable official would understand [that] what [the official] is doing violates the
16 right." See Anderson v. Creighton, 483 U.S. 635, 640 (1987). Ordinarily, once the court
17 concludes that a right was clearly established, an officer is not entitled to qualified immunity
18 because a reasonably competent public official is charged with knowing the law governing his
19 conduct. See Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982). However, even if the plaintiff
20 has alleged a violation of a clearly established right, the government official is entitled to
21 qualified immunity if he could have ". . . reasonably but mistakenly believed that his . . . conduct
22 did not violate the right." Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001); see
23 also Saucier, 533 U.S. at 205.

24            The first factors in the qualified immunity analysis involve purely legal questions.
25 See Trevino v. Gates, 99 F.3d 911, 917 (9th Cir. 1996). The third inquiry involves a legal
26 determination based on a prior factual finding as to the reasonableness of the government
27 official's conduct. See Neely v. Feinstein, 50 F.3d 1502, 1509 (9th Cir. 1995). The district court
28 has discretion to determine which of the Saucier factors to analyze first. See Pearson v. Callahan,

555 U.S. 223, 236 (2009). In resolving these issues, the court must view the evidence in the light most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff. See Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

In Defendants' section concerning qualified immunity, Defendants fail to provide factual support for their contention that they are qualifiedly immune. There remains a question as to whether the actions Defendants took violated Plaintiff's constitutional rights. If they were violated, Defendants violated Plaintiff's clearly established rights. Therefore, the Undersigned recommends denying Defendants' motion as to this issue.

## IV. CONCLUSION

Based on the foregoing, the Undersigned recommends that:

1. Defendants' motion for summary judgment, ECF No. 48, be granted in part and denied in part;

2. Plaintiff's photophobia claim is dismissed;

3. Plaintiff's ambulance claim is dismissed;

4. Plaintiff's gadolinium claim is dismissed; and

5. All other claims (Plaintiff's right foot and ankle, spine, leg wounds, shoulder, and bedside commode claims) shall continue forward.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within 14 days after being served with these findings and recommendations, any party may file written objections with the court. Responses to objections shall be filed within 14 days after service of objections. Failure to file objections within the specified time may waive the right to appeal. See Martinez v. Y1st, 951 F.2d 1153 (9th Cir. 1991).

Dated: June 7, 2022

DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE